NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CAMDEN VICINAGE

_____

|  |  |  |
|---|---|---|
| Paula Shereese JACKSON, | : | |
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | Civil No. 18-00591 (RBK) |
| Nancy A. BERRYHILL, | : | |
| Acting Commissioner of Social Security, | : | **OPINION** |
| | : | |
| Defendant. | : | |

_____ :

**KUGLER**, United States District Judge:

**THIS MATTER** comes before the Court upon the appeal of Paula Shereese Jackson

("Plaintiff") for review of the final decision of the Commissioner of Social Security. (Doc. No.

4-2). The Commissioner denied Plaintiff's application for Social Security Disability benefits,

finding that Plaintiff was not disabled as defined by the Social Security Act. As explained below,

the decision of the Commissioner is **AFFIRMED**.

I.      FACTS

A.  Procedural History

On June 3, 2013, Plaintiff protectively applied for disability insurance benefits, alleging

disability beginning November 26, 2012. R. 26. Her application for benefits was initially denied

on October 23, 2013, and again denied upon reconsideration on January 13, 2014. *Id.* Plaintiff

then filed a written request for a hearing. *Id.* On April 13, 2016, the Administrative Law Judge ("ALJ"), presiding in Pennsauken, New Jersey, held a hearing at which Plaintiff appeared and testified. *Id.*

After the ALJ allowed the medical record to remain open for the submission of additional evidence, such evidence was admitted on April 21, 2016. *Id.* Plaintiff's counsel then requested and was granted a fourteen-day extension to admit additional medical evidence, which was submitted on: April 28, 2016; May 10, 2016; May 11, 2016; May 16, 2016; May 17, 2016; and May 25, 2016. *Id.* Plaintiff's counsel noted in his May 20, 2016 brief that he would need a subpoena to retrieve the records of Jerrold Friedman, M.D., but such records were received on May 25, 2016. *Id.* Thus, the ALJ concluded that the matter was ready for decision. *Id.*

In a decision dated August 1, 2016, the ALJ found that Plaintiff was not disabled. R. 26–58. On November 16, 2017, the Appeals Council denied her request for review. R. 1–4. Plaintiff then appealed to this Court.

## B. Plaintiff's History

Plaintiff Paula Shereese Jackson is a fifty-year-old woman who lives with her husband, children, and grandson. R. 36. Her son is disabled. *Id.* She earned a high school education and worked in several positions before applying for social security benefits. Plaintiff worked at Chrysler from April 1989 to April 2007, as a material handler and auto parts assembler. R. 125, 271–72, 315–16. Plaintiff then worked at DuPont from August 2007 to April 2013, as a material handler and shipping hand. R. 125–26, 271, 273, 315, 317. Plaintiff also worked part-time at Day and Zimmerman LLC from 2001 to 2003 as a surveillance system monitor. R. 56, 240.

Plaintiff alleges she has been disabled since November 26, 2012. R. 26. At the time of her application, she suffered from a post cervical fusion, a right shoulder impingement, left carpal tunnel syndrome, left cubital tunnel syndrome status post-surgical repair, fibromyalgia, an affective disorder, and an anxiety disorder. R. 29.

At her administrative hearing, Plaintiff testified that she continues to undergo injections to her right shoulder; she cannot lift her arms over her head; and she has difficulty dressing, styling her hair, and brushing her teeth. R. 36. Plaintiff also testified that she must get up and walk around during church services at least twice, for five to ten minutes each time, throughout the two-and-a-half-hour service. *Id.* Further, Plaintiff discussed that she has trouble driving as she experiences issues gripping the wheel and turning her neck, she often brings someone to accompany her when she drives, and she can only drive for a maximum of fifteen minutes at a time. *Id.* Relatedly, she sometimes cannot move her body and "is achy all over." *Id.* She cannot get out of bed "three to five days a month," and on days she does leave her bed, "she will sit on the couch with a stool propping up her feet." *Id.*

Consistent with this testimony, Plaintiff described several restrictions on her daily life. She stated next that she can only walk the distance of one city block and stand for three to five minutes before her legs "get numb." *Id.* Plaintiff is always tired and suffers from sleep disturbances. *Id.* While she does "not trust therapy," she speaks with her minister two to three times weekly. *Id.* Lastly, Plaintiff testified that she saw Elizabeth Raush, L.C.S.W. for a period of three months but "had to stop due to the expense." *Id.*

### C. Plaintiff's Relevant Medical History

We now review Plaintiff's medical history before her treating physician, Allen Auerbach, D.O. On January 18, 2016, Plaintiff saw Dr. Auerbach for a follow-up regarding her cervical pain. R. 40, 459–66. Plaintiff exhibited tenderness in her cervical spine, and Auerbach noted several physical and mental ailments. The physical conditions included carpal tunnel syndrome, cervical myelopathy, spinal stenosis, fibromyalgia, hypercholesteremia, and hypertension. R. 465. The mental conditions included anxiety and depression. *Id.* Dr. Auerbach instructed Plaintiff to increase her physical activity. *Id.*

On February 8, 2016, Dr. Auerbach completed a Medical Source Statement in which he listed Plaintiff's symptoms as neck pain, myelopathy, back pain, joint pain, and tingling. R. 699. Dr. Auerbach opined that Plaintiff was incapable of even low stress jobs. R. 700. He further opined that Plaintiff could stand or walk for less than two hours and sit for about two hours during an eight-hour workday, with normal breaks. R. 701. Dr. Auerbach noted that Plaintiff had significant limitations with reaching and estimated that Plaintiff's impairments would cause her to be absent from work more than four days per month. R. 702.

On May 16, 2016, Dr. Auerbach completed another Medical Source Statement, which presented very similar opinions to the statement completed in February 2016. R. 703–06. However, in the May statement, Dr. Auerbach did not document any conclusion regarding Plaintiff's limitations with reaching. R. 706.

### D. Plaintiff's Adult Function Reports

Plaintiff self-reported her capabilities in an Adult Function Report dated August 6, 2013, which she completed with the assistance of Sheresse Walker. R. 33. In her Adult Function Report, Plaintiff said that she had trouble managing her personal care needs because of pain. *Id.*

Specifically, she could not prepare meals. *Id.* She also stated that she went shopping in stores and managed her finances. *Id.* Plaintiff noted that her husband and children handled the housework. *Id.* She reported that she spent time with others and got along with others, she got along with authority figures, and she had never been terminated from a job due to interpersonal issues. *Id.* Plaintiff noted difficulty with memory, concentration, stress, and changes in routine. R. 34. Plaintiff stated that she needed to be reminded "to go places," to take her medications, and to tend to her personal care. *Id.* Further, she expressed she had difficulty with written instructions but had "less difficulty with spoken instructions." *Id.*

Plaintiff completed another Adult Function Report on December 26, 2015, in which she noted she had trouble managing her personal care needs because of pain. R. 33. Plaintiff reported she ironed clothing, did laundry, prepared "simple meals," and packed her son's lunch. *Id.* She also stated that she shopped in stores and her husband helped her pay bills. *Id.* While she took her disabled son to the playground, Plaintiff reported that she had difficulty with large crowds. R. 34. Plaintiff again reported needing reminders "to go places," to take her medications, and to tend to her personal care. *Id.* She had difficulty with memory, concentration, and stress, but she alleged "less difficulty following instructions or [with] changes in routine." *Id.*

### E. The Vocational Expert's Testimony

At Plaintiff's administrative hearing, the vocational expert ("VE"), Marian R. Marracco, testified that Plaintiff's past job at Dupont was classified in the *Dictionary of Occupational Titles* ("DOT") as the position of auto parts assembler, defined at a medium exertional level. R. 26, 125. The VE testified that Plaintiff also worked at both Dupont and Chrysler in the position of material handler, as classified in the DOT, defined at a heavy exertional level, but sometimes performed at a medium level. R. 125. Next, the VE testified that Plaintiff worked another

position while at Chrysler, classified in the DOT as a shipping hand, defined at a heavy exertional level. R. 125–26. Finally, the VE testified that Plaintiff's past job at Day and Zimmerman LLC was classified in the DOT as the position of surveillance system monitor, defined at a sedentary exertional level. R. 126.

The ALJ then asked the VE to consider a hypothetical individual of Plaintiff's age, education level, and past work experience, with the ability to

> lift 20 pounds occasionally, 10 pounds frequently, can sit, stand, or walk up to six hours in an eight-hour day, would be limited to frequently reaching, handling, and fingering bilaterally, but only occasional overhead reaching and lifting with the right upper extremity. Occasional postural maneuvers, but no kneeling or crawling. Occasional climbing of ramps and stairs, but no ladders, ropes, or scaffolds. No exposure to unprotected heights and the individual can only tolerate simple, routine tasks, making simple decisions, tolerate only occasional changes in a workplace. And frequent contact with coworkers, supervisors, and the public. Would that individual be able to perform any of the past work?

R. 126–27. The VE answered, "Within that hypothetical, the surveillance system monitor . . . . [T]he rest [of the past work] would . . . exceed the [Specific Vocational Preparation] as well as the exertional." R. 127. The ALJ then asked the VE to consider a second hypothetical individual, including the same limitations as the first, but who also "would need to alternate from sitting to standing every 30 to 60 minutes, would need a five- to ten-minute change of position but would be able to remain on task." *Id.* She asked the VE whether the position of surveillance system monitor would still be available to an individual as described in the second hypothetical. *Id.* The VE answered that it would, and that although the DOT does not define a "sit/stand option," it is the VE's opinion that the surveillance system monitor position would be "amenable to that sit/stand option." *Id.*

## F. The ALJ's Decision

The ALJ followed the five-step sequential evaluation process for determining disability claims and found that Plaintiff was not disabled on August 1, 2016. *See* 20 C.F.R. § 404.1520(a)(4). First, the ALJ found that Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of November 26, 2012, through her date last insured. R. 28–29. Second, the ALJ determined that Plaintiff had several severe impairments. These included: status post cervical fusion, right shoulder impingement, left carpal tunnel syndrome, left cubital tunnel syndrome status post-surgical repair, fibromyalgia, affective disorder, and anxiety disorder. The ALJ noted that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app'x 1. R. 29–35.

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform work-related activities at a light exertional level with additional postural, manipulative, and environmental limitations. R. 51. The ALJ turned to the next step and relied on the VE's testimony, who concluded that Plaintiff could perform her past relevant work as a surveillance system monitor, and in the alternative, that there existed other jobs in the national economy that Plaintiff could perform. R. 56–58. Therefore, the ALJ found that Plaintiff was not disabled under the Act at any time during the relevant period. R. 58.

## II.    LEGAL STANDARD

When reviewing the Commissioner's final decision, this Court is limited to determining whether the decision was supported by substantial evidence, after reviewing the administrative record as a whole. *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (citing 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000).

Substantial evidence is "more than a mere scintilla but may be somewhat less than a

preponderance of the evidence." *See, e.g.*, *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir.

2005). Courts may not set aside the Commissioner's decision if it is supported by substantial

evidence, even if this court "would have decided the factual inquiry differently." *Fargnoli v.*

*Halter*, 247 F.3d 34, 38 (3d Cir. 2001).

When reviewing a matter of this type, this Court must be wary of treating the

determination of substantial evidence as a "self-executing formula for adjudication." *Kent v.*

*Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). This Court must set aside the Commissioner's

decision if it did not take into account the entire record or failed to resolve an evidentiary

conflict. *See Schonewolf v. Callahan*, 972 F. Supp. 277, 284–85 (D.N.J. 1997) (citing *Gober v.*

*Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)). Evidence is not substantial if "it really constitutes

not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created

by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153

(3d Cir. 1983) (citing *Kent*, 710 F.2d at 114). A district court's review of a final determination is

a "qualitative exercise without which our review of social security disability cases ceases to be

merely deferential and becomes instead a sham." *Kent*, 710 F.2d at 114.


### III.    DISCUSSION

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment . . .

which has lasted or can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 423(d)(1)(A). The ALJ used the established five-step evaluation process to determine whether Plaintiff was disabled. *See* 20 C.F.R. § 404.1520(a)(4).

For the first four steps of the evaluation process, the claimant has the burden of establishing her disability by a preponderance of the evidence. *Zirnsak*, 777 F.3d at 611–12. First, the claimant must show that she was not engaged in "substantial gainful activity" for the relevant time period. 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1572. Second, the claimant must demonstrate that she has a "severe medically determinable physical or mental impairment" that lasted for a continuous period of at least twelve months. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1509. Third, either the claimant shows that her condition was one of the Commissioner's listed impairments and is therefore disabled and entitled to benefits, or the analysis proceeds to step four. 20 C.F.R. § 404.1420(a)(4)(iii). Fourth, if the condition is not equivalent to a listed impairment, the claimant must show that she cannot perform her past work, and the ALJ must assess the claimant's RFC. 20 C.F.R. § 404.1520(a)(4)(iv), (e).

If the claimant meets her burden, the burden shifts to the Commissioner for the last step. *Zirnsak*, 777 F.3d at 612. At the fifth and last step, the Commissioner must establish that other available work exists that the claimant is capable of performing based on her RFC, age, education, and work experience. *Id.*; 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can make "an adjustment to other work," she is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(v).

Plaintiff makes several arguments to challenge the ALJ's determination. First, Plaintiff argues that the ALJ was not constitutionally appointed pursuant to the Appointments Clause of the United States Constitution. Pl.'s Br. (Doc. No. 12) at 4. Second, Plaintiff argues that the ALJ did not give proper weight to Plaintiff's treating physician for his opinions on Plaintiff's abilities and restrictions. *Id.* Third, Plaintiff submits that the ALJ improperly analyzed Plaintiff's

credibility. *Id.* at 5. Fourth, Plaintiff claims the ALJ erred in finding Plaintiff's past work as a surveillance system monitor to constitute past relevant work. *Id.* at 4. Finally, Plaintiff argues the ALJ's hypothetical question to the VE, on which the ALJ relied in finding Plaintiff is not disabled, did not contain all of Plaintiff's limitations. *Id.* at 5.

### A. Appointments Clause Challenge

In *Lucia v. SEC*, the Supreme Court ruled in favor of plaintiff who argued that the ALJ who heard his case at the SEC was appointed by a method which did not conform to the Appointments Clause of the U.S. Constitution. 138 S. Ct. 2044, 2055 (2018). The *Lucia* Court found that, because plaintiff had raised a "timely challenge" on this basis in his agency appeal, he was entitled to relief in the form of a hearing before a different ALJ who had been appropriately appointed. *Id.*

Plaintiff argues that *Lucia* applies to the Social Security Administration and that the ALJ was not appropriately appointed pursuant to the Appointments Clause. Pl.'s Br. at 7; Pl.'s Rep. Br. (Doc. No. 17) at 1–6. She also argues that a "timely challenge" in the Social Security context does not require that the issue be raised before the agency. *Id.* Plaintiff relies upon *Sims v. Apfel*, in which the Supreme Court held that issues raised in an appeal to a federal court of a denial of benefits need not have been exhausted by raising them before the Social Security Appeals Council. 530 U.S. 103, 112 (2000). The Eastern District of Pennsylvania recently accepted this argument and remanded a Social Security case. *Muhammad v. Berryhill*, No. 18-cv-172 (E.D. Pa. Nov. 2, 2018).[1]

This Court is not persuaded by the logic of the Eastern District of Pennsylvania. Most notably, the *Sims* argument has been uniformly rejected by courts across the country, which have

---

[1] This matter remains pending before the Eastern District of Pennsylvania.

recently ruled that a *Lucia* challenge must be raised *before* the ALJ.[2] Accordingly, because

Plaintiff did not raise an Appointments Clause issue before or during her hearing before the ALJ,

or at any time before the ALJ's decision became final, this Court finds Plaintiff has waived her

*Lucia* challenge. As such, her request for remand on this basis is denied.

### B.  Whether the ALJ's Determination Is Supported by Substantial Evidence

Plaintiff argues that the ALJ inadequately weighed the evidence in favor of Plaintiff's

ability to function and thus misrepresented her RFC. First, Plaintiff argues that the ALJ did not

give the opinion of her treating physician the proper weight pursuant to 20 C.F.R. § 404.1527.

Second, Plaintiff argues that the ALJ failed to follow the applicable regulations when assessing

Plaintiff's credibility. *Id.* § 404.1527(c). On both points, the Court finds no such error.

### 1.  The ALJ's weighing of treating physician's opinion

An ALJ has a duty to consider all medical evidence placed before her and must provide

an adequate reason for dismissing or discarding evidence. *Akers v. Callahan*, 997 F. Supp. 648,

653 (W.D. Pa. 1998) (citing *Wier ex rel. Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984)). An

ALJ must resolve conflicts in the evidence and cannot rely on a "single piece of evidence" to

satisfy the substantiality test if it fails to resolve any such conflict. *Mason v. Shalala*, 994 F.2d

1058, 1064 (3d Cir. 1993). As a general matter, an ALJ must give more weight to the opinions of

---

[2] *See, e.g.*, *Sprouse v. Berryhill*, No. 17-cv-4922, 2019 WL 1075601, at *4–6 (D.N.J. Feb. 6, 2019); *see also Bonilla-Bukhari v. Berryhill*, No. 18-cv-263, 2019 WL 1007846, at *6–9 (S.D.N.Y. Mar. 4, 2019); *Catherine V. v. Berryhill*, No. 17-cv-3257, 2019 WL 568349, at *2 (D. Minn. Feb. 12, 2019); *Axley v. Comm'r of Soc. Sec.*, No. 18-cv-1106, 2019 WL 489998, at *1–2 (W.D. Tenn. Feb. 7, 2019); *Shipman v. Berryhill*, No. 17-cv-309, 2019 WL 281313, at *3 (W.D.N.C. Jan. 22, 2019); *Velasquez ex rel. Velasquez v. Berryhill*, No. 17-cv-17740, 2018 WL 6920457, at *2 (E.D. La. Dec. 17, 2018); *Abbington v. Berryhill,* No. 17-cv-552, 2018 WL 6571208, at *1–9 (S.D. Ala. Dec. 13, 2018); *Pearson v. Berryhill*, No. 17-cv-4031, 2018 WL 6436092, at *3–4 (D. Kan. Dec. 7, 2018); *Stearns v. Berryhill*, No. 17-cv-2031, 2018 WL 4380984, at *4–6 (N.D. Iowa Sept. 14, 2018).

examining physicians over non-examining physicians, but "[a]n ALJ can reject a treating

physician's opinion, and thus obviously a consultative examiner's opinion as well, where the

opinion is: (1) not well-supported by medically acceptable clinical and laboratory diagnostic

techniques, or (2) inconsistent with other substantial evidence of record." *Ramos v. Colvin*, No.

14-cv-3971, 2016 WL 1270759, at *5 (D.N.J. Mar. 31, 2016) (quoting *Kreuzberger v. Astrue*,

No. 07-529, 2008 WL 2370293, at *4 (W.D. Pa. June 9, 2008) (citing 20 C.F.R. §§

404.1527(d)(2), 416.927(d)(2))). Ultimately, "an administrative decision should be accompanied

by a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d

700, 704 (3d Cir. 1981).

20 C.F.R. § 404.1527(c) sets forth factors to consider in determining how to weigh

evidence from medical sources, including: (1) the examining relationship; (2) the treatment

relationship, including the length, frequency, nature, and extent of the treatment; (3) the

supportability of the opinion; (4) its consistency with the record as a whole; and (5) the

specialization of the individual giving the opinion. *See Labanda v. Comm'r of Soc. Sec.*, No. 17-

cv-3354, 2018 WL 259948, at *1 (D.N.J. Jan. 2, 2018); *see also Davern v. Comm'r of Soc. Sec.*,

660 F. App'x 169, 172 (3d Cir. 2016) (noting that "the weight due a medical opinion depends on

a variety of factors" under 20 C.F.R. § 404.1527(c)). An ALJ need not explicitly discuss each

factor in her decision. *See Green v. Colvin*, No. 13-cv-3463, 2014 WL 3105037, at *7 (D.N.J.

July 2, 2014). "Where inconsistency in evidence exists, the ALJ retains significant discretion in

deciding whom to credit." *Ganges v. Comm'r of Soc. Sec.*, No. 17-cv-1982, 2018 WL 5342717,

at *11 (D.N.J. Oct. 29, 2018) (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).

However, the ALJ "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186

F.3d at 429 (quoting *Mason*, 994 F.2d at 1066).

Here, the ALJ properly assigned little weight to the portion of Dr. Auerbach's opinion that is at issue before the Court because the ALJ found it to be inconsistent with the medical record as a whole.[3] R. 55. In fact, the ALJ articulated 13 reasons by which the medical record weighed against the opinion of Dr. Auerbach. *Id.* Plaintiff argues, however, that SSR 96–2p compelled the ALJ to give controlling weight to a treating source's medical opinion if it was "well-supported and not inconsistent." But Dr. Auerbach's opinion regarding Plaintiff's significant walking and standing limitations, for example—which would lead to a finding that Plaintiff is capable of no more than sedentary work—is inconsistent with his own treatment notes stating Plaintiff should "increase her physical activity." R. 465.

The ALJ had a wealth of contradictory evidence before her. And, judging the evidence necessarily entailed discarding some of at least one expert opinion in order to reach a conclusion on Plaintiff's legal status. Ultimately, if the treating physician's opinion conflicts with other medical evidence, then the ALJ is free to give that opinion less than controlling weight or even reject it, so long as the ALJ clearly explains her reasons and makes a clear record. *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 148 (3d Cir. 2007); *cf. Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC."). The ALJ did so, and clearly explained her reasoning.

Plaintiff provides several unavailing arguments supporting her contention that the ALJ erroneously failed to afford great weight to Dr. Auerbach's opinions. Pl.'s Br. at 10–19. First,

---

[3] The ALJ assigned great weight to Dr. Auerbach's determination that Plaintiff could never climb ladders because his opinion that "the combination of [Plaintiff's] severe impairments affecting her upper extremities prevent[s] her from climbing ladders" was consistent with the medical record as a whole. R. 55. As to the remainder of Dr. Auerbach's opinions, however, the ALJ gave little weight. *Id.*

Plaintiff alleges that the ALJ "discount[ed] the myelopathy" diagnosis of Dr. Auerbach because of the ALJ's mistake of fact regarding the development of Plaintiff's myelopathic symptoms. *Id.* at 14–15. As such, Plaintiff claims that this "led [the ALJ] to underestimate the severity of [Plaintiff's] impairments and overestimate her RFC as a result." Pl.'s Rep. Br. at 10–11.

Plaintiff's first argument is unconvincing because it fundamentally misinterprets the ALJ's opinion. Plaintiff appears to interpret the ALJ's conclusion that Plaintiff "did not develop myelopathic symptoms until 2015" to mean that Plaintiff's myelopathy first developed in 2015. *Id.* This is an overly narrow reading that ignores much of the opinion. As argued by the Commissioner, it is far more likely that the ALJ intended her statement regarding the development of myelopathic symptoms to indicate the resurfacing of myelopathic symptoms following her 2013 surgery to correct her myelopathy. Def.'s Br. (Doc. No. 13) at 19. In other words, the Court finds that the ALJ's conclusions regarding Plaintiff's myelopathy refer only to Plaintiff's *post-surgery* development of symptoms, as such development is only noted in the ALJ's decision immediately after the conclusion that Plaintiff "experienced a good outcome from her cervical surgery in 2013." R. 49, 55.

Plaintiff's argument is especially unpersuasive after considering the other portions of the ALJ's decision. For example, the ALJ devoted several pages of the decision to her review of Plaintiff's cervical condition post-surgery. R. 37–40. The ALJ appears to carefully chronicle and consider all of Plaintiff's relevant mental and physical impairments. This careful and reasoned opinion shows that the ALJ afforded Plaintiff's symptoms substantial consideration. Plaintiff's attempts to parse individual sentences and ignore the broader rationale of the ALJ's analysis are simply unconvincing.

Even if this court accepted Plaintiff's argument that the ALJ mistakenly believed Plaintiff's first myelopathic onset was in 2015, Plaintiff fails to make clear why such an error would impact how the ALJ weighed Dr. Auerbach's opinion. Dr. Auerbach simply opined Plaintiff suffered from cervical myelopathy on January 18, 2016, R. 465; he did not, however, provide an opinion that would contradict the allegedly mistaken assertion that Plaintiff in fact did have myelopathic symptoms post-surgery but prior to 2015. The Court finds this to be little more than a supposed distinction without a difference.

Second, Plaintiff argues the ALJ improperly concluded that Dr. Auerbach's medical opinion of Plaintiff's physical limitations, namely her impinged shoulder, contradicted the record as a whole. Plaintiff reasons that impingement evidence is irrelevant because "Dr. Auerbach based his opinions on Plaintiff's other impairments, and did not mention her shoulder impairment as one of the diagnoses in either of his statements." Pl.'s Br. at 15. While Dr. Auerbach did not list a right shoulder impingement diagnosis on his Medical Source Statements, R. 699, 703, he nonetheless evaluated Plaintiff's "reaching" abilities. R. 702. And on February 8, 2016, Dr. Auerbach noted Plaintiff had "significant limitations with reaching." R. 54, 702.

Contrary to Plaintiff's argument, the ALJ correctly found Auerbach's treatment of Plaintiff's shoulder to be inconsistent with the record as a whole. For example, Plaintiff responded positively to injections, tested negative for various shoulder conditions, and sought only intermittent treatment since 2012. R. 50. In addition, Plaintiff failed to submit results of any imaging studies that would "support the extent and severity of her pain." R. 50. Therefore, Dr. Auerbach's opinion that Plaintiff had "significant limitations with reaching" in 2016 is inconsistent with substantial evidence to the contrary. Defendant's brief further notes several medical experts who offered contrary conclusions to Dr. Auerbach regarding Plaintiff's shoulder.

Third, Plaintiff argues that the ALJ's misstatement of a month in which medical treatment was discontinued constituted reversible error. Plaintiff argues that the ALJ erroneously gave less weight to Dr. Auerbach's opinions because the ALJ stated Plaintiff only received treatment for fibromyalgia until May 2015, when in fact she received treatment until June 2015. Pl.'s Br. at 15–16. The ALJ reasoned that, although Plaintiff "experienced little success from conservative treatment, the absence of treatment after *May* 2015 suggests her symptoms were generally well controlled on her treatment regimen." R. 55 (emphasis added).

The Court disagrees with Plaintiff's formalistic efforts. The ALJ did in fact acknowledge in her discussion of Plaintiff's fibromyalgia that Plaintiff received treatment from Dr. Cronin until June 2015. R. 50. Further, even to the extent that the ALJ misstated the exact month in her discussion of the weight afforded to Dr. Auerbach's opinions, Plaintiff has not plausibly alleged how the difference of one month—May 2015 versus June 2015—amounts to reversible error on the part of the ALJ. Again, the absence of treatment for fibromyalgia after early summer of 2015 suggests that Plaintiff's symptoms were generally well controlled. As such, the ALJ's primary justification remains unphased by Plaintiff's arguments.

## 2. The ALJ's weighing of Plaintiff's credibility

Plaintiff next contends that the ALJ failed to properly assess Plaintiff's credibility in rendering her decision. Pl.'s Br. at 19–21. Specifically, Plaintiff complains that the ALJ erred as a matter of law because "the ALJ clearly stated that it was the 'objective' medical evidence alone which persuaded her to discredit Plaintiff's statements regarding the degree of pain and limitation she has as a result of her medically determined impairments." *Id.* at 20.

The Court disagrees with Plaintiff's argument because she does not identify for the Court the portion of her testimony that the ALJ should have considered. *See Holloman v. Comm'r of*

*Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) ("Whether or not the ALJ's analysis . . . was sufficiently thorough, [plaintiff] offers no explanation of how further analysis could have affected the outcome of [her] disability claim."); *see also Woodson v. Comm'r of Soc. Sec.*, 661 F. App'x 762, 766 (3d Cir. 2016) ("But [plaintiff] never explains how, even if the ALJ's analysis was lacking, the deficiency was harmful to [her] claims."). Instead, the Plaintiff appears to take issue with the ALJ's credibility determination without expressly identifying the more credible testimony. Thus, Plaintiff's vague assertion that the ALJ discredited her statements based on the "'objective' evidence alone" falls flat. Accordingly, the Court finds substantial evidence supports the ALJ's determination as to Plaintiff's credibility.

### C. Whether the ALJ's Analysis of Past Relevant Work Is Supported by Substantial Evidence

Plaintiff argues that the ALJ erred in finding Plaintiff's past work as a surveillance system monitor to be "past relevant work." Pl's Br. at 8. Specifically, because the ALJ concluded that Plaintiff's earnings as a surveillance system monitor do not exceed the substantial gainful activity threshold, Plaintiff submits that the ALJ erred in its consideration of this work as past relevant work. *Id.*

First, the Court finds that the ALJ's analysis of past relevant work appears wholly satisfactory. The ALJ first concluded that Plaintiff's past employment as a surveillance system monitor is past relevant work and that such work would not be precluded by Plaintiff's RFC. R. 56. But the ALJ continued to an analysis under step five of the sequential process with "alternative findings" that other jobs in the national economy existed—jobs which Plaintiff is capable of performing. R. 56–57. She determined, after hearing testimony from a vocational expert, that Plaintiff is capable of performing various jobs, such as school bus monitor, dispatch

router, and information clerk, each of which existed in significant numbers in the national economy. R. 57. This analysis is consistent with the legal requirements under the Act.

Plaintiff further attempts to conflate a threshold level of earnings with the regulatory definition of past relevant work. As the regulation defines, relevant work is work that is substantially gainful during the past fifteen years. 20 C.F.R. § 404.1560(b)(1). Furthermore, substantially gainful work is work that is both *substantial* and *gainful*. The ALJ correctly concluded that a surveillance system monitor performs substantial work, or work that involves significant mental or physical activity. *See id.* § 404.1572(a). Relatedly, the ALJ correctly noted that this work is gainful work, since it is done for a profit. *See id.* § 404.1572(b). Plaintiff appears to take issue with the ALJ noting that her work as a surveillance system monitor, since it was part-time work, did not rise to a level to presume substantially gainful activity. The work, however, was both *substantial* and *gainful* under the regulation. *See id.* § 404.1572. Thus, it is of no consequence whether the ALJ erred in concluding that Plaintiff's prior employment as a surveillance system monitor constituted past relevant work.

Even if the Court agreed with Plaintiff's attempts to parse the regulation further, such alleged error is harmless because the ALJ properly conducted an analysis under step five and concluded that jobs existed in significant numbers in the national economy that Plaintiff is capable of working. Because this analysis under step five is supported by substantial evidence, the Court finds no merit in Plaintiff's argument that the ALJ "denied [Plaintiff's] claim based on her purported ability to perform th[e] sedentary job [of surveillance system monitor]." Pl's Br. at 8.

### D. Whether the ALJ's Hypothetical Question to the VE Is Supported by Substantial Evidence

Plaintiff's final argument asserts that the ALJ failed to present all of Plaintiff's limitations in her hypothetical to the VE because the ALJ "did not [include] all of the limitations assessed by Dr. Auerbach," Plaintiff's treating physician. Pl.'s Br. at 21–22. However, because the Court already concluded above that the ALJ was appropriate in affording little weight to Dr. Auerbach's opinions, this argument fails. *See McDonald v. Astrue*, 293 F. App'x 941, 946 (3d Cir. 2008) ("The hypothetical posed to the vocational expert adequately reflected all of [the plaintiff's] impairments that had support in the record . . . ."). Again, the ALJ determined that Dr. Auerbach's opinions were not supported by the record as a whole, and therefore, the Court finds no error in the ALJ's hypothetical to the VE on the basis that it did not include Dr. Auerbach's inconsistent findings.

**CONCLUSION**

For the reasons discussed above, this Court will **AFFIRM** the Commissioner's decision.

Dated: March 29, 2019                                          s/ Robert B. Kugler

                                                                        ROBERT B. KUGLER

                                                                        United States District Judge